IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

**UNITED STATES OF AMERICA,**

**Plaintiff,**

**v.**

**DION HALASKA,**

**Defendant.**                                              No. 07-CR-40049-DRH

## MEMORANDUM AND ORDER

**HERNDON, Chief Judge:**

### I. Introduction

On August 28, 2003, government agents executed two search warrants at a property identified as 17095 Route 37, Johnson City, Illinois. Defendant Dion Halaska ("Defendant") has filed a motion to suppress all evidence obtained during the execution of the two search warrants. (Doc. 41.) The Government filed a response in opposition. (Doc. 56.) On November 29, 2007, the Court held a hearing on the motion to suppress. (Doc. 41.) Having taken the evidence and arguments under advisement, the Court has determined that Defendant's motion should be granted in part and denied in part for the following reasons.

### II. Background

On August 27, 2003, agents from the offices of the Illinois Secretary of State ("ISOS") and the Southern Illinois Enforcement Group obtained a warrant to search the property identified as 17095 Route 37 in Johnson City, Illinois. (Doc. 41-

1

2.) The search warrant directed agents to search the "compound," which it described as "four mobile home/house trailers, a concrete block styled barn located on the southwest corner of the facility, a camper styled trailer located in a wooded area west of the open land, and multiple vehicles and outbuildings." (*Id*.) The first search warrant was for the purpose of searching for evidence of the offense of operation of an unlicensed repairer, rebuilder, and used motor vehicle dealer; failure to keep records; and failure to use Secretary of State uniform invoice for essential parts. Investigator Fred Brown of the Illinois Secretary of State Police submitted an affidavit in support of the search warrant. (Doc. 46-3.) The affidavit was based upon agents' surveillance of the property beginning in April 2003 and interviews with informants who had information about activities occurring on the "compound," which would support the allegation that an unlicensed business was operating on the premises. However, located on the "compound" were separate mobile homes where several individuals lived. Attached to the affidavit was a Williamson County Recorder's Office legal description of the property indicating that all of the buildings comprising the "compound" are located on a single parcel of property owned by Dion Halaska's father, Anton Halaska, III. The first affidavit is addressed to Deon (sic) and Tony Halaska. (Doc. 46-2.) The first affidavit makes no mention of who lived in each of the mobile homes or whether or not Dion Halaska even lived on the property.

The first search warrant was executed on the morning of August 28, 2003. During the course of that search, agents seized numerous vehicles, car manuals, and car parts. (Def.'s Ex. I, addendum.) In addition, agents photographed

2

a number of "trash piles" at unidentified locations around the "compound," which they believed contained evidence of the manufacturing of methamphetamine. Based on the agents' belief that the items found in the trash piles - an LP tank, a starting fluid can, and gas generator bottles - suggested that methamphetamine was being manufactured on the premises, agents sought a second search warrant. The second warrant affidavit was based solely on the photographs of the trash piles; however, "there was nothing in the second warrant affidavit that connected the items photographed with any particular residence or outbuilding on the 'compound'." (Doc. 46, p. 3.) Apparently the issuing judge found that the photographs provided a sufficient basis for probable cause to issue a second search warrant, this time for the purpose of searching for evidence of methamphetamine manufacturing. Agents returned to the property that same day with the second search warrant in hand. The second search warrant authorized a search of the entire "compound," described specifically again (as in the first search warrant) as consisting of "four mobile home/house trailers, a concrete block styled barn located on the southwest corner of the facility, a camper styled trailer located in a wooded area west of the open land, and multiple vehicles and outbuildings." (Doc. 46-5.) In the course of executing this second search warrant, agents seized numerous items from Dion Halaska's mobile home. Agents left a return copy at the "residence of Dion Halaska" listing the items that they seized. (Def.'s Ex. J.)

According to Dion Halaska's sister, Wendy Beaumont, who lived in one of the mobile homes located on the property, law enforcement agents woke her up

3

in her bedroom, handcuffed her, and took her outside, where they were also holding her husband in handcuffs. (Def.'s Ex. H.) Agents informed Ms. Beaumont that they had found some "drug-making materials" but that they were "going to spare [her] the trauma of searching [her] trailer." (*Id.*) At the suppression hearing, Ms. Beaumont testified that each of her brothers, Dion and Tony Halaska, individually owned the other two mobile homes on the property and that each residence had its own mailbox, separate power connection, and meter. She also testified that her brothers stayed in their trailers all the time, as far as she was aware.

Following Ms. Beaumont's testimony, the Government called two witnesses, Fred Brown and Kendall Long. In 2003, Fred Brown, an Illinois Secretary of State agent, was assigned to the Halaska property to work with the Southern Illinois Enforcement Group's ("SIEG") drug task force. Brown testified that during the four months he was investigating activities at the property that he would drive by the property at least two to three times a week to conduct surveillance. In addition, Brown testified that he set up stationary surveillance at different locations off-site on a number of occasions. Brown further testified that he believed that family members lived in the center trailer on the property, but he was not certain who it was. However, he also testified that some of his people had run a title search on the vehicle in front of the center trailer and that it was properly titled and registered to the people who lived there.

As for the other trailers, Brown testified that he did not believe that anyone actually lived in the trailers, but thought instead that people just hung around

the trailers. He specifically testified that he assumed - "with the exception of the trailer in the center" - that it was all "one big piece of property." He further testified that prior to the search he believed that Dion lived in West Frankfort. Despite this testimony, Agent Brown left a duplicate copy of the search warrant return for Dion Halaska at his residence, although he could not say exactly how he determined that that particular trailer was Dion's residence. But, he testified that he believed that Dion was the target of the investigation. He also said that he did not recall seeing any mailboxes attached to the property.

Kendall Long also testified at the hearing. In 2003, Long, as part of the SIEG drug task force, was assigned to investigate the Halaska property. He spent six months investigating the property prior to applying for the search warrant. He stated that he probably performed stationary surveillance on the property between 40 and 50 times. He testified that he had informants tell him methamphetamine was being produced at the compound and that he had intelligence indicating a likely location where the methamphetamine was being produced. However, he testified that informants never referred to any of the trailers as Dion's residence. He further testified that he was unsure about who might be living there and that he was uncertain whether Dion lived there or at his father's house. He also testified that he did not remember seeing any mailboxes around the property and that he did not attempt to determine whether or not there were separate electric accounts for the trailers because he was not certain who was living in the trailers, *except* for the one in middle. As for the center trailer, Long confirmed that he knew, prior to the

5

search, that the trailer belonged to Wendy Beaumont and her husband and that it was a "separate" residence. He also testified that he left a return copy addressed to Dion Halaska in his trailer because he vaguely recalls finding a box in that particular trailer with Dion's name on it.

## III. <u>Analysis</u>

Defendant argues that the first search violated his Fourth Amendment rights because the affidavit failed to notify the issuing judge that the compound consisted of a number of separate residences (although it did state that there were multiple mobile homes) - even though agents were aware of that fact - and therefore, the search warrant was overbroad because it did not establish probable cause for the search of each individual residence. The Government argues that the warrants identified the "Compound" as including "four mobile home/house trailers, a concrete block styled barn located on the southwest corner of the facility, a camper styled trailer located in a wooded area west of the open land, and multiple vehicles and outbuildings." (Doc. 41-5.) The Government contends that this description was sufficiently particularized and that the issuing judge must have found probable cause for agents to search the entire Compound. Moreover, the Government maintains that it was reasonable, based on information gathered by the affiant, to believe that the Defendant had access to the entire property and that the property was being used as a single unit. The Court agrees with Defendant that the search violated Defendant's Fourth Amendment rights because it was not conducted pursuant to a valid search warrant.

There is an entire body of cases devoted to the issue of whether a warrant covering multiple residences is overbroad and, therefore, invalid. "A warrant is valid under the Fourth Amendment only where it is based 'upon probable cause, supported by Oath or affirmation, and particularly describ[es] the place to be searched, and the persons or things to be seized." **Jacobs v. City of Chicago, 215 F.3d 758, 767 (7th Cir. 2000) quoting U.S. Const. amend. IV**. The Seventh Circuit has "consistently held that probable cause to search one apartment in a multi-unit building does not support a warrant authorizing a search of the entire building. Rather, 'when a building is divided into more than one residential unit, a distinct probable cause determination must be made for each unit.'" *Id.* **quoting United States v. Butler, 71 F.3d 243, 248 (7th Cir. 1995).** In other words, a single warrant "may cover several different places or residences in a single building. But probable cause must be shown for searching each residence unless it be shown that, although appearing to be a building of several apartments, the entire building is actually being used as a single unit." **United States v. Hinton, 219 F.2d 324, 326 (7th Cir. 1955).**

This is not, however, a case where officers conducted a search pursuant to a warrant obtained based on a *mistaken* belief or description of the premises. *See Maryland v. Garrison,* **480 U.S. 79 (1987) (finding that the "validity of the warrant must be assessed on the basis of the information that the officers disclosed, or had a duty to discover and to disclose, to the issuing Magistrate.")**

***Id*. at 86.** Agents Brown and Long testified that they were aware prior to the execution of the search warrant that Wendy Beaumont lived in the middle mobile home. In addition, although the agents had not bothered to investigate utility or phone services for each of the individual residences or to take note of the individual mailboxes, they had confirmed that it was Wendy Beaumont's car that was parked outside of the middle mobile home on a regular basis. And while the agents offered conflicting testimony regarding whether Dion and his brother, Anton, lived at the "Compound" (even after the second search was conducted) , the agents, in advance of the first search, were fairly clear that they *knew* that Wendy Beaumont lived in the middle mobile home. Moreover, the fact that officers did not even attempt to search Wendy Beaumont's residence, despite rousing her out of bed and handcuffing her and her husband, provides further evidence that the agents had no reason to believe that probable cause existed to search her trailer. "Plainly, if the officers had known, or even if they should have known, that there were two separate dwelling units on the third floor of 2036 Park Avenue, they would have been obligated to exclude [the dwelling] from the scope of the requested warrant." ***Garrison*, 480 U.S. at 85**. This is *not* a case of realizing that the warrant was overbroad only through the benefit of hindsight. Agents knew before they ever stepped foot on the "Compound" that Wendy Beaumont's trailer was outside the scope of their search; nevertheless, it was included in the affidavit and search warrant.

        The Government maintains that the Court should apply the standard

established in ***Franks v. Delaware*, 438 U.S. 154 (1978)**, which requires a showing that misstatements of fact in a supporting affidavit were either intentional or included with reckless disregard for the truth. Defendant disagrees that a ***Franks*** analysis applies to this line of cases, based in part on the Supreme Court's ruling in ***Garrison***, which seems to have established a different standard for analyzing claims that a warrant is overly broad and lacks probable cause. The Court agrees. ***Garrison*** followed ***Franks*** and offered a distinct framework for analyzing the issuance and execution of warrants that are overly broad.

Lastly, the Government argues that the "single unit" exception, which holds that probable cause must be shown for each individual unit unless the entire premises are being used as a single unit, applies to this case. (Doc. 56, p.6.) The Government argues that the entire premises known as the compound was being used as a single unit to conduct illegal activities. But this is simply not the case. The testimony at the hearing confirmed that agents knew *prior to* the application for the search warrants that the center trailer was a "separate residence" and the fact that agents did not bother searching Ms. Beaumont's residence provides further proof that they did not believe that her residence was involved in the activities alleged in each search warrant. Nevertheless, her residence was included in both the first and the second warrants. Furthermore, just because the police have reason to believe that illegal activities are taking place on a property made up of multiple units, they are not authorized to go on a fishing expedition to locate the origin of the activity

9

without particularized probable cause. The "single unit" exception will not cover these situations. As the ***Garrison*** Court, which held that reasonable mistakes will not invalidate an otherwise legitimate warrant, noted:

> We expressly distinguish the facts of this case from a situation in which the police know there are two apartments on a certain floor of a building, and have probable cause to believe that drugs are being sold out of that floor, but do not know in which of the two apartments the illegal transactions are taking place. A search pursuant to a warrant authorizing a search of the entire floor under those circumstances would present quite different issues from the ones before us in this case.

***Garrison*, 480 U.S. at 89, fn. 13.**

Based on all that agents knew prior to making the affidavits in support of their applications for search warrants, at the very least, agents did not have probable cause to search Wendy Beaumont's trailer. Inclusion of Wendy Beaumont's trailer in each search warrant rendered each warrant overly broad and, therefore, invalid. The Court need not determine, therefore, whether there was sufficient probable cause to search the other trailers pursuant to either the first or the second search warrants. Nonetheless, the Court would note that it has serious reservations about whether probable cause was even sufficiently established to support a search of the other trailers located on the property.

Having found that both the first and second warrants were overly broad, the Court orders that all evidence discovered as part of the first and second searches be suppressed. However, the Court understands that some evidence was found in areas where Defendant Dion Halaska had no legally-recognized expectation of

10

privacy. Specifically, the Court finds that the evidence discovered outside of the garage in the trash piles was in plain view in an area accessible to the public. Although the Halaska brothers' car repair business was unlicensed, it was open to the public. Agents observed people entering the property and travelling down the driveway to the garage. The evidence contained in photographs two and four of Exhibit L, therefore, is not excluded.

## IV. Conclusion

For the foregoing reasons, the Court **GRANTS** Defendant Dion Halaska's motion to suppress (Doc. 41) to the extent that all evidence obtained from both searches is suppressed, except for the evidence contained in photographs two and four of Exhibit L.

**IT IS SO ORDERED.**

Signed this 26th day of February, 2008.

/s/ *David R Herndon*
**Chief Judge
United States District Court**